UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LISA LEE ALICE BROWN,

       Plaintiff,

vs.

                                        Case No.: 23-
                                        HON.:

ST. CLAIR COUNTY; ST. CLAIR COUNTY JAIL;
ST. CLAIR COUNTY SHERIFF MAT KING;
ST. CLAIR COUNTY CHIEF DEPUTY JOHN
MCWATERS, SERGEANT DONALD FLEMING;
DEPUTY STACEY CRAWFORD; DEPUTY "John
Doe" KOVECK; DEPUTY "John
Doe" BIRD; CORRECTION OFFICER
KELLY MURPHY; CORRECTION OFFICER
MATTHEW ALLEN; CORRECTION OFFICER
BRADLEY CURTISS; CORRECTION OFFICER
NICHOLAS LAPP; CORRECTION OFFICER
JESSICA BARR; CORRECTION OFFICER
KIMBERLY SPAULDING; CORRECTION
OFFICER MATTHEW METHENY; CORRECTION
OFFICER KEITH KRZYWIECKI; CORRECTION
OFFICER KRISTEN ABBEY; DEPUTY JOHN DOE
1 -5; DEREK STEELE, RN, ANDREA SANGSTER,
LPN, KAREN HUTCHINSON, LPN, ALLISON
LAFRINIERE, RN, IMOHTEP CARTER, MD,
and CHS TX, INC., f/k/a CORIZON HEALTH

       Defendants.

**COMPLAINT AND DEMAND**
**FOR JURY TRIAL**

---

BRIAN J. McKEEN (P34123)
TODD C. SCHROEDER (P81607)
Mckeen & Associates, PC
Attorneys for Plaintiff
645 Griswold St., Suite 4200
Detroit, MI 48226
(313) 961-4400
tschroeder@mckeenassociates.com

---

      NOW COMES Plaintiff LISA LEE ALICE BROWN, by and through her attorneys,

MCKEEN & ASSOCIATES, P.C., and for her Complaint and Demand for Jury Trial hereby states

the following:

## JURISDICTION AND VENUE

1.      That this Court has jurisdiction of this action under the provisions of Title 28 of the United States Code, Sections 1331 and 1367.

2.      Venue lies in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b) The unlawful actions alleged in this Complaint took place in St. Clair County located within the Eastern District of Michigan.

3.      That each and every act of Defendants, as set forth herein, were done by those Defendants under the color and pretense of the statutes, ordinances, regulations, laws, customs, and usages of the State of Michigan, and by virtue of, and under the authority of, each individual Defendants' employment with the State of Michigan.

4.      The amount in controversy exceeds Seventy -Five Thousand ($75,000.00) Dollars, excluding costs, interest and attorney fees and is otherwise within the jurisdiction of this court.

## GENERAL ALLEGATIONS

5.      Plaintiff Lisa Lee Alice Brown was at all times relevant hereto a resident of the County of St. Clair, State of Michigan.

6.      At all times relevant, Defendant St. Clair County was and is a political subdivision duly incorporated under the laws of the State of Michigan, and it is the body responsible for the control and oversight of its departments, agencies, and facilities, including the operation and staffing of St. Clair County Jail, with said operation and staffing including the organization, training, operation, and discipline of staff correctional officers and medical and mental health personnel at that facility, including the individual Defendants.

7.      At all times relevant, Defendant St. Clair County Jail was and is a political subdivision duly incorporated under the laws of the State of Michigan, and it is the body responsible for the control and oversight of its departments, agencies, and facilities, including the

operation and staffing of St. Clair County Jail, with said operation and staffing including the organization, training, operation, and discipline of staff correctional officers and medical and mental health personnel at that facility, including the individual Defendants.

8.      At all times relevant, Defendant, St. Clair County Sheriff Mat King ("King"), at all times relevant herein, upon information and belief, resided in the County of St. Clair, State of Michigan, was the duly elected Sheriff of St. Clair County. King was a policy maker for the St. Clair County Jail ("SCCJ") and represented the ultimate repository of law enforcement power in the SCCJ. King was responsible for the supervision and oversight of St. Clair County Deputy Sheriffs. As St. Clair County Sheriff, King exercised administrative, command, fiscal and policy making authority over the St. Clair County Sheriff Department, and at all times herein, was acting under the color of state law and is being sued in his official capacity.

9.      As the St. Clair County Sheriff, Defendant, King, was employed by statute to protect the lives and property of St. Clair County citizens by enforcing State laws and local ordinances, investigating crimes, and detaining prisoners remanded to the SCCJ in a manner which maintains the highest degree of professional excellence, integrity, and courtesy. His duties also included performing law enforcement, jail and support missions in a humane manner which reflects sensitivity to the dignity and equal rights of all citizens and reinforces the values of our community. These duties further included addressing misconduct and discipline of the corrections officers and medical staff working within the SCCJ.

10.     At all times relevant, Defendant, St. Clair County Chief Deputy, John McWaters ("McWaters"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was employed by the St. Clair County Sheriff Department as the Chief Deputy of Corrections. McWaters was a supervisor and a policy maker for the SCCJ. McWaters was acting within the

scope of his employment and under the color of State law and is being sued in his official capacity as a policy maker and Chief Deputy of Corrections.

11.     As the St. Clair County Chief Deputy, Defendant, McWaters, was employed by statute to protect the lives and property of St. Clair County citizens by enforcing State laws and local ordinances, investigating crimes, and detaining prisoners remanded to the SCCJ in a manner which maintains the highest degree of professional excellence, integrity, and courtesy. His duties also included performing law enforcement, jail and support missions in a humane manner which reflects sensitivity to the dignity and equal rights of all citizens and reinforces the values of our community. These duties further included addressing misconduct and discipline of the corrections officers and medical staff working within the SCCJ.

12.     At all times relevant, Defendant, Sergeant Donald Fleming ("Fleming"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Sergeant, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

13.     At all times relevant, Defendant, Stacey Crawford ("Crawford"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

14.     At all times relevant, Defendant, "John Doe" Bird  ("Bird"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a  Deputy or Corrections Officer, and was acting under the

4

color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

15.     At all times relevant, Defendant, Kelly Murphy ("Murphy"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

16.     At all times relevant, Defendant, Matthew Allen ("Allen"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

17.     At all times relevant, Defendant, Bradley Curtis ("Curtis"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

18.     At all times relevant, Defendant, Nicholas Lapp ("Lapp"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

19.     At all times relevant, Defendant, Jessica Barr ("Barr"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair

County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

20.     At all times relevant, Defendant, Kimberly Spaulding ("Spaulding"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

21.     At all times relevant, Defendant, Matthew Metheny ("Metheny"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

22.     At all times relevant, Defendant, Keith Krzywiecki ("Krzywiecki"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of his employment at the SCCJ, and is being sued in his individual capacity.

23.     At all times relevant, Defendant, Kristen Abbey ("Abbey"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of her employment at the SCCJ, and is being sued in her individual capacity.

24.     At all times relevant, Defendant, "John Doe" Koveck ("Koveck"), upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of her employment at the SCCJ, and is being sued in her individual capacity.

25.     At all times relevant, Defendants, John Does 1 - 5, upon information and belief, resided in the County of St. Clair, State of Michigan, and were and are employed by the St. Clair County Sheriff Department as a Deputy or Corrections Officer, and was acting under the color of State law and in the course and scope of her employment at the SCCJ, and is being sued in his individual capacity.

26.     At all times relevant, Defendant Derek Steele, RN ("Steele")  upon information and belief, resided in the County of St. Clair, State of Michigan, and was and is a licensed registered nurse, employed by CHS TX, Inc., f/k/a Corizon Health and/or the SCCJ, and was acting under the color of State law and in the course and scope of his employment with CHS TX, Inc., f/k/a Corizon Health and/or SCCJ, at the SCCJ, and is being sued in his individual capacity.

27.     At all times relevant, Defendant Allison LaFriniere, RN ("LaFriniere") upon information and  belief, resided in the County of St. Clair, State of Michigan, and was and is a licensed registered nurse, employed by CHS TX, Inc., f/k/a Corizon Health and/or the SCCJ, and was acting under the color of State law and in the course and scope of his employment with CHS TX, Inc., f/k/a Corizon Health and/or SCCJ, at the SCCJ, and is being sued in his individual capacity.

28.     At all times relevant, Defendant Andrea Sangster, LPN ("Sangster") upon information and  belief, resided in the County of St. Clair, State of Michigan, and was and is a licensed registered nurse, employed by CHS TX, Inc., f/k/a Corizon Health and/or the SCCJ, and

was acting under the color of State law and in the course and scope of his employment with CHS TX, Inc., f/k/a Corizon Health and/or SCCJ, at the SCCJ, and is being sued in his individual capacity.

29.     At all times relevant, Defendant Karen Hutchinson, LPN ("Hutchinson") upon information and  belief, resided in the County of St. Clair, State of Michigan, and was and is a licensed registered nurse, employed by CHS TX, Inc., f/k/a Corizon Health and/or the SCCJ, and was acting under the color of State law and in the course and scope of his employment with CHS TX, Inc., f/k/a Corizon Health and/or SCCJ, at the SCCJ, and is being sued in his individual capacity.

30.     At all times relevant, Defendant Imohtep Carter, MD, ("Carter") upon information and  belief, resided in the County of St. Clair, State of Michigan, and was and is a licensed Internal Medicine physician, employed by CHS TX, Inc., f/k/a Corizon Health and/or the SCCJ, and was acting under the color of State law and in the course and scope of his employment with CHS TX, Inc., f/k/a Corizon Health and/or SCCJ, at the SCCJ, and is being sued in his individual capacity.

31.     At all times relevant, Defendant CHS TX, Inc., f/k/a Corizon Health, upon information and  belief, resided in the County of St. Clair, State of Michigan, and was contracted with St. Clair County to provide medical services to inmates at SCCJ, and is the entity responsible for the control and oversight of the operation and staffing of medical personal and facilities at SCCJ, including the organization, hiring, training, operation, supervision, retention and discipline of staff medical personnel at SCCJ and the medical training of St. Clair County correctional employees.

32.     At all times relevant, each individual Defendant identified herein was an employee/agent of St. Clair County and/or the SCCJ, engaging in the exercise of a governmental

function and conduct within the course, scope, and authority of his/her/their employment/agency with St. Clair County and/or the SCCJ.

33.    The acts set forth in this Complaint arise under Section 1 of the Civil Rights Act of 1871, 17 stat. 13, 42 U.S.C. Sec. 1983 in the Eighth and Fourteenth Amendments to the United States Constitution, unless the cause of action indicates that it arises under the laws of the State of Michigan, in which case the court has supplemental or pendent jurisdiction.

34.    The amount in controversy exceeds $75,000 exclusive of interest, costs, and fees.


## **FACTS**

35.    Plaintiff repeats and re-alleges the allegations contained in all prior paragraphs of Plaintiff's Complaint as though fully incorporated herein.

36.    Ms. Brown is a 48-year-old with a history of substance abuse (on suboxone) and Raynaud's Syndrome.

37.    She became an inmate at St. Clair County Jail on April 20, 2021, for operating a motor vehicle under the influence.

38.    She was ambulating well, was eating her meals, and was alert and oriented x 3.


### APRIL 24, 2021

39.    On April 24, 2021, at 1:59 A.M., Barr documented that Ms. Brown's cell mate had informed staff that Ms. Brown had fallen off her bunk, "hit her head", and that "medical" had been notified.

40.    It was further noted that Ms. Brown's vital signs had been taken twice and were normal.  No other testing was ordered or performed.

41.     Sangster noted that Brown did not know where she was at, and was unable to sit up or move her arms or legs.

42.     Sangster noted that Brown thought she was at hospital when asked where she was, and that she was unable to sit up, even with the assistance of multiple people.

43.     Fleming and Bird placed Brown in restraints and transported her "to assessments".

44.     Several hours after her fall, Brown was not able to change her position and was not eating. At 6:21 A.M., Spaulding wrote: "Inmate placed on medical lockdown per nurse Sangster.  Inmate is still in same position lying on the floor, has not eaten any breakfast."

45.     For the remainder of April 24, 2021, Brown did not eat any food.


APRIL 25, 2021

46.     On April 25, 2021, at 4:57PM, Murphy documents that Brown continued to not any food through at least through 7PM on April 25, 2021:

> "For both of my shifts 7a – 7pm yesterday (4/24/21) and today (4/25/21) this inmate has not eaten any food. She has drank 3 cups of fluids."

47.     At 11:55PM, Andrea Sangster, LPN, noted that Ms. Brown was "still stating that she is unable to move on her own and needing assistance to sit up, drink, and eat."


APRIL 26, 2021

48.     On April 26, 2021, at 4:16 A.M., Allen documents that Brown had been moving off her mat all night and yelling incoherent things. Allen further noted: "… she acts like she cannot move at all."

49.     At 5:20 A.M., Fleming documented that he had asked the nursing staff if a doctor will come in to look at Brown.

50.    During medication pass, Steele went into Brown's cell to do a medical assessment and asked Brown to sit up. Steele asked Brown to sit up, and she replied, "I can't". Steele asked why not, and Brown responded, "I can't move". Kryzywiecki then assisted Steele by "sliding" Brown against the wall.

51.    At 9:02 A.M., Curtiss documented that Brown was asked to come out of her cell to retrieve her medication, but Brown **"stated that she could not get up because of her neck and would need help to sit up. I attempted to assist [Brown] by *grabbing* her right hand and *pulling* her up to the seated position. When she got to that position she *fell* back onto her back."

52.    Crawford assisted Curtiss at 9:02AM. Crawford likewise observed that Brown could not move on her own.

53.    Later, Crawford asked Brown to roll to her stomach and then attempt to stand up. Crawford noted that Brown could roll onto her stomach but then could not get up.

54.    Metheny then arrived and assisted Crawford. Crawford documents that she and Metheny then rolled Brown back into the laying position by applying force to Brown's shoulder and hip.

55.    While in the lying position, Allison asked Brown if she would like to rest against the wall, to which Brown responded affirmatively. Crawford and Curtiss then each took a side of Brown and "slid [Brown to the wall".

56.    Crawford then noted mental status changes in Brown and that she was saying things that did not make sense and would "talk about people that were not present as though they were and then would seem coherent."

57.    Then, according to Crawford, "[Brown] had a medical complaint that she talked to the nurse about." Allison then assessed Brown. Crawford then notes: "When the nurse was done

with the assessment, [Brown] stated she could no longer stay seated". Crawford and Metheny then assisted to the laying position.

58.     At 10:04AM, LaFriniere noted Brown's statement that "I can't move." Lafriniere then assessed Brown due to Brown's complaint of not being able to move. Brown stated that the last time she used the toilet was three days ago.

59.     Lafriniere notified Carter of these findings, who provided no new orders and only instructions to continue to monitor Brown.

60.     Ms. Brown was never physically evaluated by a physician, nurse practitioner or physician assistant while she was an inmate at St. Clair County Jail.

61.     At 7:11PM, LaFriniere documented that she reviewed the video footage of Brown and noted **"For the last 48 hours, it appears that Brown "did not move from supine to sitting position one time. Also, [Brown] observed not toileting for the last 48 hours."**

62.     LaFriniere then notified the on-call physician regarding her findings and received a verbal order to send Brown to the emergency room by ambulance.

63.     LaFriniere notified custody that Brown would be transferred to the hospital.

64.     The on-call physician then noted: "Security asked if it could wait until the morning but I have insisted on her immediate transfer."

65.     Shortly before 2000, EMS transported Ms. Brown to McLaren Port Huron, where the impression of CT scan included the following:

> There is a vertebra fracture with instability and anterior subluxation of C5 in relation to C6." There are fractures of the left side pedicle and lamina and transverse process of C5. There is almost unilateral locked facet of C5-C6 on the right side. This fracture of the superior and inferior articular facets of C5 on the left side. [sic]

66.     It was documented that Ms. Brown had stated that she had not had suboxone in 5 days and that she could not move her arms or legs and was experiencing severe neck pain.

67.     It was also noted that Ms. Brown was reporting decreased sensation in her torso, arms, and legs.

68.     With respect to the neurological exam, the physician documented that Ms. Brown was only able to wiggle her right toes and fingers slightly and otherwise appeared to be paralyzed from the neck down.

69.     He also noted that she had limited sensation from the neck down as well.

70.     Ms. Brown was diagnosed with a C5 fracture, and a C-collar was applied.

71.     The physician noted that he had been unable to detect rectal tone when he did a rectal exam.

72.     He further documented that Ms. Brown had limited movement of her right fingers and was unable to lift her arm, and that she had limited sensation in the right hand and was not able to move the left hand at all.

73.     He additionally noted that Ms. Brown was unable to lift her right leg and had minimal movement of the left foot with no sensation.

74.     The physician decided to transfer Ms. Brown to a facility with neurosurgery coverage and he noted the following: "It is felt as though the patient has a devastating injury. She is informed of findings."

75.     At approximately 2239, Ms. Brown was transferred by EMS to McLaren Macomb for a higher level of care.

76.     At McLaren Macomb, Ms. Brown underwent 2 cervical spine surgeries, including a fusion.

77.     Unfortunately, she has permanent neurological damage and has been diagnosed with paralysis.

78.     She is unable to use her left hand and it remains in a claw-like position.

13

79.     She has lost much of the function of her left leg, and she has decreased sensation from the chest down to her toes.

80.     Ms. Brown requires the use of a wheelchair for medium to long distances, and for short distances, she needs a cane or a walker.

81.     She also suffers from urinary and bowel incontinence.

82.     Ms. Brown's physician documented that she is no longer able to work.

83.     Her permanent paralysis and sequelae have also caused depression and anxiety.

84.     Ms. Brown has a new diagnosis of anxiety and has also suffered increased depression.

85.     Needless to say, the quality of her life has been greatly reduced.

## COUNT I

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

### VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 U.S.C. §1983 (CORRECTION DEFENDANTS)

### DEFENDANTS
### SERGEANT DONALD FLEMING; STACEY CRAWFORD; KOVECK; BIRD; KELLY MURPHY; MATTHEW ALLEN; BRADLEY CURTISS; NICHOLAS LAPP; JESSICA BARR; KIMBERLY SPAULDING; MATTHEW METHENY; KEITH KRZYWIECKI; KRISTEN ABBEY; JOHN DOES 1 – 5

### ("CORRECTIONS DEFENDANTS")

86.     Plaintiff restates and re-alleges each and every allegation contained in paragraphs one (1) through eighty-five (85) as if fully set forth herein.

87.     Defendants Murphy, Allen, Fleming, Curtiss, Lapp, Crawford, Barr, Spaulding, Metheny, Krzywiecki, Abbey, Koveck, Bird, and Does 1 - 5 (hereinafter, the "Corrections Defendants") were acting under the color of state law, and subjected Brown to a deprivation of her

14

rights, privileges and immunities secured by the Constitution and laws of the United States and the State of Michigan.

88.     Pursuant to 42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution, the St. Clair Defendants owed Brown duties to act prudently and with reasonable care, and otherwise act without imposing cruel and unusual punishment.

89.     That the acts or omissions by the Corrections Defendants, as more specifically described in the General Allegations Section above, were unreasonable and performed knowingly, wantonly, deliberately, indifferently, intentionally, maliciously, willfully, and with gross negligence, callousness, consciousness, and deliberate indifference to Brown's well-being and serious medical needs.

90.     That Brown's medical needs were objectively serious, as they were diagnosed by a medical professional and/or were so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

91.     That the Defendants had subjective knowledge of the serious risk of harm to Brown and disregarded the risk by the acts and/or omissions as outlined in the General Allegations Section above.

92.     That the conduct of the Corrections Defendants, individually, deprived Brown of her clearly established rights, privileges, and immunities guaranteed under the United States Constitution, specifically those set forth under the Eighth and Fourteenth Amendments to same, as evidenced by the facts outlined above.

93.     As a direct and proximate result of the actions of the Corrections Defendants and their deliberate indifference to Brown's serious medical needs, she suffered prolonged pain and discomfort; having permanent paralysis; having spasticity in her left leg and left hand (which is permanently in a claw-like position); having reduced sensation from her chest down to her toes;

15

having urinary and bowel incontinence; suffering worsening depression; suffering anxiety; being

unable to work; and requiring the use of a wheelchair, walker and cane for ambulation.

94.     The conduct of Corrections Defendants was willful and exhibited a flagrant

disregard for Brown's federally secured rights, and was undertaken with malice and/or reckless

disregard for Brown's constitutional rights. Accordingly, these defendants are liable to Brown

under 42 U.S.C. ' 1983.

95.     WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter

judgment in her favor and against Defendants, jointly and severally, and award of compensatory

and punitive damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars

exclusive of costs, interest, attorney fees.

## COUNT II

### FAILURE TO TRAIN, FAILURE TO SUPERVISE, AND INADEQUATE POLICIES, PROCEDURES, CUSTOMS AND PRACTICES - DELIBERATE INDIFFERENCE

### VIOLATION OF CIVIL RIGHTS PURSUANT TO 42 USC §1983 (MONELL CLAIM – ST. CLAIR COUNTY)

### DEFENDANTS
### ST. CLAIR COUNTY, ST. CLAIR COUNTY JAIL; ST. CLAIR COUNTY SHERIFF MAT KING; ST. CLAIR COUNTY CHIEF DEPUTY JOHN MCWATERS

### ("ST. CLAIR COUNTY DEFENDANTS")

96.     Plaintiff hereby restates and re-alleges each and every allegation contained in

paragraphs one (1) through ninety-five (95) as if fully set forth herein.

97.     42 U.S.C. § 1983 states:

> Every person, who under the color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress ...

98.     Defendants, St. Clair County, St. Clair County Jail, Mat King, and John McWaters, ("St. Clair County Defendants") had an obligation to supervise, monitor and train their agents and employees, including the individual St. Clair County Defendants named herein, to ensure that the Constitutional rights of Brown and similarly situated citizens were not violated.

99.     St. Clair County Defendants, as the final policy-makers for the county, failed to adequately train, staff, report, supervise, monitor, investigate and/or discipline their correction officers and/or medical services personnel, with respect to AWS and/or delirium tremens, signs, symptoms, monitoring, and/or indications for medical intervention, leading the failures as set forth by way of illustration in Paragraph 102 above.

100.    That the St. Clair County Defendants further adopted, promulgated, encouraged, condoned, and/or tolerated official customs, policies, practices, and/or procedures, including such for failing to train and/or supervise their employees/agents, and were the final policy-maker within the Sheriff Department and/or the SCCJ.

101.    That the motivating and moving force for the individual Defendants' conduct as described herein, such that same also amounted to the deprivation of Brown's Eighth and Fourteenth Amendment Rights, were the following unconstitutional official policies, procedures, customs and/or practices of the Correction Defendants such that same amounted to the deprivation of Brown's Eighth and Fourteenth Amendment Rights:

a.   A policy, custom or practice of failing to provide sufficient correctional and medical health staff coverage for inmates at the SCCJ;

b.   A policy, custom or practice of failing to follow the staffing guidelines as set forth in the standards published by the NCCHC;

c.   A policy, custom or practice of providing financial incentives to employees who prevented emergency room visits by inmates of the SCCJ;

d.   A policy, custom or practice of not referring inmates suffering from a serious injury to licensed acute care facilities and/or hospital settings;

e.   A policy, custom or practice of denying inmates at the SCCJ access to appropriate, competent and necessary care for serious medical needs;

f.   A policy, custom or practice of failing to provide adequate supervision to assist medical personnel by an on-site physician;

g.   A policy, custom or practice of denying SCCJ inmates necessary medical care if said inmate is thought to be serving a short sentence or to be released shortly;

h.   A policy, custom or practice of discouraging transferring inmates to a licensed acute care facility and/or hospital for medical care;

i.   A policy, custom or practice of failing to follow and enforce the contract terms that required audits, specifically a Medical Audit Committee to review all jail health care services for quality of care through established and regularly performed health care audits, and recommend and implement all policies and procedures for jail health care;

j.   A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant CHS TX, Inc. to tailor and adopt policies and procedures for health care at the SCCJ, and to provide those policies and procedures to Defendant, St. Clair County, employees and officials; said policies and procedures were to be consistent with the standards set forth by the NCCHC;

k.   A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, CHS TX, Inc., to maintain minimum staffing levels, at the SCCJ, and the failure to enforce led to CHS TX to under-staff the medical care at SCCJ and/or substitute less qualified and lesser paid medical staff than required by the Contract;

l.   A policy, custom or practice of failing to enforce and follow the Contract terms requiring Defendant, CHS TX, to notify Defendant, St. Clair County, of all claims made against it; thereby revealing a pattern of proving deficient medical services by Defendant, CHS TX;

m.   A policy, custom or practice of failing to adequality monitor Correction Defendants  performance to ensure it met staffing commitments and provided quality health care;

n.   A policy, custom or practice of failing to enforce the Contract terms requiring that all medical personnel working at the SCCJ are properly licensed in the State of Michigan;

18

     o.    Any other policies, customs or practices that become known through the course of discovery.

102.    As a direct and proximate result of the wrongful conduct of each of the individual Defendants due to the St. Clair County Defendants' failure to train, failure to supervise, and their inadequate policies, procedures, customs and/or practices, Plaintiff has been substantially and irreparably.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, and award of compensatory and punitive damages in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

### COUNT III
### MEDICAL MALPRACTICE

### DEFENDANTS
### CHS TX, INC., DEREK STEELE, RN, ANDREA SANGSTER, LPN, KAREN HUTCHINSON, LPN, and ALLISON LAFRINIERE, RN

103.    Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through one hundred two (102) as if fully set forth herein.

104.    At all times relevant to this lawsuit, as more fully set forth above, Defendant CHS TX, Inc., f/k/a Corizon Health, undertook and had a duty to provide Brown with competent medical care and treatment, through and by its employees and/or agents, which would at all times be in accordance with the acceptable standards of care.

105.    At all times relevant to this lawsuit, Defendants, Derek Steele, RN, Andrea Sangster, LPN, Karen Hutchinson, LPN, and Allison LaFriniere, RN, were employees of Defendant, CHS TX, and/or actual agents and/or apparent/ostensible agents of Defendant, CHS TX, and acting in the course and scope of their employment with Defendant, CHS TX, and thus,

Defendant, CHS TX, is vicariously liable for medical personnel's acts of medical malpractice pursuant to the doctrine of Respondent Supervisor and/or Ostensible Agency.

106.    At the time of the Brown's incarceration, Defendants Derek Steele, RN, Andrea Sangster, LPN, Karen Hutchinson, LPN, and Allison LaFriniere, RN, owed a duty to Brown, to act reasonably, prudently and to comply with the pertinent standard of care by way of their care and treatment of Brown.

107.    Although required by the standard of practice, Defendant, CHS TX, Steele, Sangster, Hutchinson, and LaFrieniere, failed to follow the applicable standard of care.

108.    Although required by the standard of practice, Defendant, CHS TX, failed to select and retain only competent physicians, nurses, nurse practitioners, licensed practical nurses, technicians, and/or staff and use reasonable means to periodically evaluate their competency so as only to retain competent physicians, nurses, nurse practitioners, licensed practical nurses, technicians, and/or staff.

109.    Defendant, CHS TX, individually, as well as its authorized agents, servants and/or employees, including but not limited to Defendants, Derek Steele, RN, Andrea Sangster, LPN, Karen Hutchinson, LPN, and Allison LaFriniere, RN, breached the above duties and obligations owed to Brown, by acting contrary to the applicable standards of care, and therefore committed medical malpractice and are professionally negligent in the following particular manners, which include, but are not limited to:

    a. Recommend appropriate medications;

    b. Take a thorough history and perform a thorough physical exam;

    c. Review Ms. Brown's medications;

    d. Refrain from suddenly stopping medications that require a weaning schedule;

    e. Help write appropriate weaning schedules and help prescribe necessary medications;

f. Heed and appreciate that Ms. Brown is taking medications that can cause drowsiness and dizziness;

g. Heed and appreciate that Ms. Brown is going through medication withdrawal;

h. Heed and appreciate that Ms. Brown cannot properly convey her symptoms since she is experiencing hallucinations and is incoherent;

i. Help adjust medications as needed;

j. Heed and appreciate that Ms. Brown is a fall risk;

k. Verify that appropriate fall precautions are in place;

l. Recommend and help write orders for appropriate fall precautions;

m. Ensure that Ms. Brown is not sleeping on a top bunk bed;

n. Promptly evaluate Ms. Brown when she has neurological symptoms that include, but are not limited to, being incoherent, having hallucinations, having acute mental status changes, and being unable to move;

o. Perform appropriate neurological and musculoskeletal exams on Ms. Brown;

p. Promptly evaluate Ms. Brown when it is documented that she fell off her top bunk bed;

q. Refrain from moving Ms. Brown after she falls off the top bunk of her bed;

r. Refrain from moving Ms. Brown when she suffers a fall and then complains of being unable to move;

s. After Ms. Brown falls from the top bunk of her bed, promptly call paramedics or appropriate healthcare personnel to safely move her and transport her to a hospital;

t. Regularly and thoroughly evaluate Ms. Brown and perform a proper physical exam and review of systems;

u. Heed and appreciate that Ms. Brown did not urinate or defecate at all after suffering a fall and promptly have her transported to a hospital;

v. Promptly evaluate Ms. Brown when it is documented that she is unable to move without assistance;

w. Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation and spine (including cervical spine) imaging studies;

x. Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation on the morning of April 24, 2021;

y. Promptly send or make a recommendation to send Ms. Brown to a hospital when she becomes incoherent, is having hallucinations, and / or is experiencing acute mental status changes;

z. Refrain from failing to perform neurological and musculoskeletal exams on Ms. Brown;

aa. Refrain from failing to promptly send Ms. Brown to the hospital for evaluation;

bb. Consult with any and all necessary specialists;

cc. Obtain informed consent;

dd. Advocate for the safety of Ms. Brown;

ee. Follow the chain of command as needed;

ff. Notify the physician of any acute changes;

gg. Notify the physician when Ms. Brown falls from the top bunk;

hh. Notify the physician when Ms. Brown is unable to move; and

ii. Guard against any other negligent act or omission that may come to light during the course of discovery in this matter.

110.    As a direct and proximate result of Lisa Brown's healthcare providers' failures as outlined above, Brown suffered prolonged pain and discomfort; having permanent paralysis; having spasticity in her left leg and left hand (which is permanently in a claw-like position); having reduced sensation from her chest down to her toes; having urinary and bowel incontinence; suffering worsening depression; suffering anxiety; being unable to work; and requiring the use of a wheelchair, walker and cane for ambulation.

111.    Within a reasonable degree of medical probability, the above-referenced healthcare providers' violations of the standards of care, as described above, caused Ms. Brown's injuries. In

addition, as a consequence of the above-referenced health care providers' negligence, Ms. Brown has damages and the sequelae therefrom, including but not limited to, various medical, prescriptive, psychological, nursing, therapy and hospital expenses, pain, suffering, emotional distress, humiliation, fright, depression, loss of enjoyment of life, and other damages, all of which are past, present, and future. Ms. Brown further claims all elements of damages permitted under Michigan's statutory law and common law, whether known now or whether becoming known during the pendency of this case.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Seventy- Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

**COUNT IV**
**ORDINARY NEGLIGENCE AND/OR GROSS NEGLIGENCE**

**DEFENDANTS**
**CHS TX, INC, IMOHTEP CARTER, MD, DEREK STEELE, RN, ANDREA SANGSTER, LPN, KAREN HUTCHINSON, LPN, and ALLISON LAFRINIERE, RN**

112.    Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through one hundred eleven (111) as if fully set forth herein.

113.    Brown was exhibiting signs of injury that any reasonable and prudent individual would understand required immediate medical attention. Further, the type of injury and/or signs and symptoms of Brown's injuries are within the realm of common knowledge and experience as being the kind of injury and/or sign and symptoms of injury that required immediate medical attention.

114.    CHS TX, Inc., Carter, Steele, Sangster, Hutchinson, and LaFriniere, failed to ensure that Brown received timely and appropriate medical intervention for her injuries, despite being

23

confronted with signs and symptoms of injuries that are within the realm of common knowledge and experience as requiring timely and immediate and appropriate medical care and treatment.

115.    As a direct and proximate result of CHS TX, Inc., Carter, Steele, Sangster, Hutchinson, and LaFriniere's failure to provide Brown with timely and immediate and appropriate medical care and treatment, which would include immediate transfer to an acute care facility, as any layperson would do, Ms. Brown has damages and the sequelae therefrom, including but not limited to, various medical, prescriptive, psychological, nursing, therapy and hospital expenses, pain, suffering, emotional distress, humiliation, fright, depression, loss of enjoyment of life, and other damages, all of which are past, present, and future. Ms. Brown further claims all elements of damages permitted under Michigan's statutory law and common law, whether known now or whether becoming known during the pendency of this case.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, jointly and severally, in an amount in excess of Seventy- Five Thousand ($75,000.00) Dollars exclusive of costs, interest, attorney fees.

<u>**A JURY TRIAL IS HEREBY DEMANDED**</u>

Respectfully Submitted:

McKEEN & ASSOCIATES, P.C.

/s/ *Brian J. McKeen*

BRIAN J. McKEEN (P34123)
TODD C. SCHROEDER (P81607)
Attorneys for Plaintiffs
645 Griswold St., Suite 4200
Detroit, MI 48226
(313) 961-4400

Dated: October 22, 2023

**RE:    LISA LEE ALICE BROWN**

<u>**AFFIDAVIT OF MERITORIOUS CLAIM STEPHEN FURMAN, RN**</u>

STATE OF VIRGINIA                              )
                                                         )ss.
COUNTY OF BUCKINGHAM            )

   I, Stephen Furman, RN, by this Affidavit, state that during the relevant time period at issue in this matter, I was a licensed and practicing Registered Nurse, specializing in, and devoting my professional time to being a Registered Nurse, and I attest to the following:

  1.  I have read the Notice of Intent to File a Claim in this action.

  2.  I have reviewed all of the medical records provided to me by Plaintiff's Counsel.

  3.  Derek Steele, RN, a licensed registered nurse, specializing in the clinical work of a registered nurse, and an agent and/or employee of CHS TX, Inc., when confronted with a patient with the signs and symptoms such as those demonstrated by LISA LEE ALICE BROWN, had a duty to timely and properly:

    a.  Recommend appropriate medications;

    b.  Take a thorough history and perform a thorough physical exam;

    c.  Review Ms. Brown's medications;

    d.  Refrain from suddenly stopping medications that require a weaning schedule;

    e.  Help write appropriate weaning schedules and help prescribe necessary medications;

    f.  Heed and appreciate that Ms. Brown is taking medications that can cause drowsiness and dizziness;

    g.  Heed and appreciate that Ms. Brown is going through medication withdrawal;

    h.  Heed and appreciate that Ms. Brown cannot properly convey her symptoms since she is experiencing hallucinations and is incoherent;

McKeen & Associates, P.C.  ●  645 Griswold Street, Suite 4200  ●  Detroit, MI 48226  ●  (313) 961-4400

i.     Help adjust medications as needed;

j.     Heed and appreciate that Ms. Brown is a fall risk;

k.     Verify that appropriate fall precautions are in place;

l.     Recommend and help write orders for appropriate fall precautions;

m.     Ensure that Ms. Brown is not sleeping on a top bunk bed;

n.     Promptly evaluate Ms. Brown when she has neurological symptoms that include, but are not limited to, being incoherent, having hallucinations, having acute mental status changes, and being unable to move;

o.     Perform appropriate neurological and musculoskeletal exams on Ms. Brown;

p.     Promptly evaluate Ms. Brown when it is documented that she fell off her top bunk bed;

q.     Refrain from moving Ms. Brown after she falls off the top bunk of her bed;

r.     Refrain from moving Ms. Brown when she suffers a fall and then complains of being unable to move;

s.     After Ms. Brown falls from the top bunk of her bed, promptly call paramedics or appropriate healthcare personnel to safely move her and transport her to a hospital;

t.     Regularly and thoroughly evaluate Ms. Brown and perform a proper physical exam and review of systems;

u.     Heed and appreciate that Ms. Brown did not urinate or defecate at all after suffering a fall and promptly have her transported to a hospital;

v.     Promptly evaluate Ms. Brown when it is documented that she is unable to move without assistance;

w.     Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation and spine (including cervical spine) imaging studies;

x.     Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation on the morning of April 24, 2021;

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

y.    Promptly send or make a recommendation to send Ms. Brown to a hospital when she becomes incoherent, is having hallucinations, and / or is experiencing acute mental status changes;

z.    Refrain from failing to perform neurological and musculoskeletal exams on Ms. Brown;

aa.    Refrain from failing to promptly send Ms. Brown to the hospital for evaluation;

bb.    Consult with any and all necessary specialists;

cc.    Obtain informed consent;

dd.    Advocate for the safety of Ms. Brown;

ee.    Follow the chain of command as needed;

ff.    Notify the physician of any acute changes;

gg.    Notify the physician when Ms. Brown falls from the top bunk;

hh.    Notify the physician when Ms. Brown is unable to move; and

ii.    Guard against any other negligent act or omission that may come to light during the course of discovery in this matter.

4.    It is my opinion, based upon the available information, as well as my training knowledge, education, and experience as a registered nurse, that there was a failure to do those acts listed above, and such omissions constitute violations of the applicable standard of care.

5.    In order to have conformed to the standard of care, the above-named should have done those things listed in the respective subsections above.

6.    As a direct and proximate result of Derek Steele, RN's failure to identify Lisa as a fall risk, and failure to implement proper precautions to avoid Lisa suffering a fall, and failure to initiate appropriate treatment once Lisa fell from her bed, Lisa suffered a fall when she fell from the top bunk bed, and she had waited 2½ - 3 days before she received medical treatment. Now

her left side is numb and stiff, and she walks with a cane and requires a wheelchair for long distances.

7. Had Derek Steele, RN performed a proper Fall Risk Assessment, initiated proper Fall Risk Protocol for Lisa's condition, and initiated appropriate treatment once Lisa fell from her bed, Lisa would not have suffered the fall on April 24, 2021 and/or would not have suffered neurological deficits due to the delay in receiving appropriate treatment.

8. Had this fall been avoided, or timely treatment received, Lisa would have the full use of the left-side of her body. If not for the negligence of Lisa's healthcare providers, the left-side of her body would not have sustained injuries.

9. This opinion is based upon a review of the information to date and may or may not change upon review of additional materials.

10. Allison LaFriniere, RN, a licensed registered nurse, specializing in the clinical work of a registered nurse, and an agent and/or employee of CHS TX, Inc., when confronted with a patient with the signs and symptoms such as those demonstrated by LISA LEE ALICE BROWN, had a duty to timely and properly:

    a. Recommend appropriate medications;

    b. Take a thorough history and perform a thorough physical exam;

    c. Review Ms. Brown's medications;

    d. Refrain from suddenly stopping medications that require a weaning schedule;

    e. Help write appropriate weaning schedules and help prescribe necessary medications;

    f. Heed and appreciate that Ms. Brown is taking medications that can cause drowsiness and dizziness;

    g. Heed and appreciate that Ms. Brown is going through medication

– 4 –

McKeen & Associates, P.C.  ●  645 Griswold Street, Suite 4200  ●  Detroit, MI 48226  ●  (313) 961-4400

withdrawal;

h.  Heed and appreciate that Ms. Brown cannot properly convey her symptoms since she is experiencing hallucinations and is incoherent;

i.  Help adjust medications as needed;

j.  Heed and appreciate that Ms. Brown is a fall risk;

k.  Verify that appropriate fall precautions are in place;

l.  Recommend and help write orders for appropriate fall precautions;

m.  Ensure that Ms. Brown is not sleeping on a top bunk bed;

n.  Promptly evaluate Ms. Brown when she has neurological symptoms that include, but are not limited to, being incoherent, having hallucinations, having acute mental status changes, and being unable to move;

o.  Perform appropriate neurological and musculoskeletal exams on Ms. Brown;

p.  Promptly evaluate Ms. Brown when it is documented that she fell off her top bunk bed;

q.  Refrain from moving Ms. Brown after she falls off the top bunk of her bed;

r.  Refrain from moving Ms. Brown when she suffers a fall and then complains of being unable to move;

s.  After Ms. Brown falls from the top bunk of her bed, promptly call paramedics or appropriate healthcare personnel to safely move her and transport her to a hospital;

t.  Regularly and thoroughly evaluate Ms. Brown and perform a proper physical exam and review of systems;

u.  Heed and appreciate that Ms. Brown did not urinate or defecate at all after suffering a fall and promptly have her transported to a hospital;

v.  Promptly evaluate Ms. Brown when it is documented that she is unable to move without assistance;

w.  Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation and spine (including cervical spine) imaging studies;

x.  Promptly send or make a recommendation to send Ms. Brown to a hospital

McKeen & Associates, P.C.   ●   645 Griswold Street, Suite 4200   ●   Detroit, MI 48226   ●   (313) 961-4400

– 5 –

for evaluation on the morning of April 24, 2021;

y. Promptly send or make a recommendation to send Ms. Brown to a hospital when she becomes incoherent, is having hallucinations, and / or is experiencing acute mental status changes;

z. Refrain from failing to perform neurological and musculoskeletal exams on Ms. Brown;

aa. Refrain from failing to promptly send Ms. Brown to the hospital for evaluation;

bb. Consult with any and all necessary specialists;

cc. Obtain informed consent;

dd. Advocate for the safety of Ms. Brown;

ee. Follow the chain of command as needed;

ff. Notify the physician of any acute changes;

gg. Notify the physician when Ms. Brown falls from the top bunk;

hh. Notify the physician when Ms. Brown is unable to move; and

ii. Guard against any other negligent act or omission that may come to light during the course of discovery in this matter.

11. It is my opinion, based upon the available information, as well as my training knowledge, education, and experience as a registered nurse, that there was a failure to do those acts listed above, and such omissions constitute violations of the applicable standard of care.

12. In order to have conformed to the standard of care, the above-named should have done those things listed in the respective subsections above.

13. As a direct and proximate result of Allison LaFriniere's, LPN's failure to identify Lisa as a fall risk, and failure to implement proper precautions to avoid Lisa suffering a fall, and failure to initiate appropriate treatment once Lisa fell from her bed, Lisa suffered a fall when she fell from the top bunk bed, and she had waited 2½ - 3 days before she received medical

treatment. Now her left side is numb and stiff, and she walks with a cane and requires a wheelchair for long distances.

14.     Had Allison LaFriniere, LPN, performed a proper Fall Risk Assessment, initiated proper Fall Risk Protocol for Lisa's condition, and initiated appropriate treatment once Lisa fell from her bed, Lisa would not have suffered the fall on April 24, 2021 and/or would not have suffered neurological deficits due to the delay in receiving appropriate treatment.

15.     Had this fall been avoided, or timely treatment received, Lisa would have the full use of the left-side of her body. If not for the negligence of Lisa's healthcare providers, the left-side of her body would not have sustained injuries.

16.     This opinion is based upon a review of the information to date and may or may not change upon review of additional materials.

17.     Andrea Sangster, LPN, a licensed registered nurse, specializing in the clinical work of a registered nurse, and an agent and/or employee of CHS TX, Inc., when confronted with a patient with the signs and symptoms such as those demonstrated by LISA LEE ALICE BROWN, had a duty to timely and properly:

    a.   Recommend appropriate medications;

    b.   Take a thorough history and perform a thorough physical exam;

    c.   Review Ms. Brown's medications;

    d.   Refrain from suddenly stopping medications that require a weaning schedule;

    e.   Help write appropriate weaning schedules and help prescribe necessary medications;

    f.   Heed and appreciate that Ms. Brown is taking medications that can cause drowsiness and dizziness;

    g.   Heed and appreciate that Ms. Brown is going through medication

McKeen & Associates, P.C.   •   645 Griswold Street, Suite 4200   •   Detroit, MI 48226   •   (313) 961-4400

withdrawal;

h.    Heed and appreciate that Ms. Brown cannot properly convey her symptoms since she is experiencing hallucinations and is incoherent;

i.    Help adjust medications as needed;

j.    Heed and appreciate that Ms. Brown is a fall risk;

k.    Verify that appropriate fall precautions are in place;

l.    Recommend and help write orders for appropriate fall precautions;

m.    Ensure that Ms. Brown is not sleeping on a top bunk bed;

n.    Promptly evaluate Ms. Brown when she has neurological symptoms that include, but are not limited to, being incoherent, having hallucinations, having acute mental status changes, and being unable to move;

o.    Perform appropriate neurological and musculoskeletal exams on Ms. Brown;

p.    Promptly evaluate Ms. Brown when it is documented that she fell off her top bunk bed;

q.    Refrain from moving Ms. Brown after she falls off the top bunk of her bed;

r.    Refrain from moving Ms. Brown when she suffers a fall and then complains of being unable to move;

s.    After Ms. Brown falls from the top bunk of her bed, promptly call paramedics or appropriate healthcare personnel to safely move her and transport her to a hospital;

t.    Regularly and thoroughly evaluate Ms. Brown and perform a proper physical exam and review of systems;

u.    Heed and appreciate that Ms. Brown did not urinate or defecate at all after suffering a fall and promptly have her transported to a hospital;

v.    Promptly evaluate Ms. Brown when it is documented that she is unable to move without assistance;

w.    Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation and spine (including cervical spine) imaging studies;

x.    Promptly send or make a recommendation to send Ms. Brown to a hospital

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

– 8 –

for evaluation on the morning of April 24, 2021;

y.    Promptly send or make a recommendation to send Ms. Brown to a hospital when she becomes incoherent, is having hallucinations, and / or is experiencing acute mental status changes;

z.    Refrain from failing to perform neurological and musculoskeletal exams on Ms. Brown;

aa.    Refrain from failing to promptly send Ms. Brown to the hospital for evaluation;

bb.    Consult with any and all necessary specialists;

cc.    Obtain informed consent;

dd.    Advocate for the safety of Ms. Brown;

ee.    Follow the chain of command as needed;

ff.    Notify the physician of any acute changes;

gg.    Notify the physician when Ms. Brown falls from the top bunk;

hh.    Notify the physician when Ms. Brown is unable to move; and

ii.    Guard against any other negligent act or omission that may come to light during the course of discovery in this matter.

18.    It is my opinion, based upon the available information, as well as my training knowledge, education, and experience as a registered nurse, that there was a failure to do those acts listed above, and such omissions constitute violations of the applicable standard of care.

19.    In order to have conformed to the standard of care, the above-named should have done those things listed in the respective subsections above.

20.    As a direct and proximate result of Andrea Sangster, LPN's failure to identify Lisa as a fall risk, and failure to implement proper precautions to avoid Lisa suffering a fall, and failure to initiate appropriate treatment once Lisa fell from her bed, Lisa suffered a fall when she

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

fell from the top bunk bed, and she had waited 2½ - 3 days before she received medical treatment. Now her left side is numb and stiff, and she walks with a cane and requires a wheelchair for long distances.

21.     Had Andrea Sangster, LPN, performed a proper Fall Risk Assessment, initiated proper Fall Risk Protocol for Lisa's condition, and initiated appropriate treatment once Lisa fell from her bed, Lisa would not have suffered the fall on April 24, 2021 and/or would not have suffered neurological deficits due to the delay in receiving appropriate treatment.

22.     Had this fall been avoided, or timely treatment received, Lisa would have the full use of the left-side of her body. If not for the negligence of Lisa's healthcare providers, the left-side of her body would not have sustained injuries.

23.     This opinion is based upon a review of the information to date and may or may not change upon review of additional materials.

24.     Karen Hutchinson, LPN, a licensed registered nurse, specializing in the clinical work of a registered nurse, and an agent and/or employee of CHS TX, Inc., when confronted with a patient with the signs and symptoms such as those demonstrated by LISA LEE ALICE BROWN, had a duty to timely and properly:

     a.   Recommend appropriate medications;

     b.   Take a thorough history and perform a thorough physical exam;

     c.   Review Ms. Brown's medications;

     d.   Refrain from suddenly stopping medications that require a weaning schedule;

     e.   Help write appropriate weaning schedules and help prescribe necessary medications;

     f.   Heed and appreciate that Ms. Brown is taking medications that can cause drowsiness and dizziness;

McKeen & Associates, P.C.  ●  645 Griswold Street, Suite 4200  ●  Detroit, MI 48226  ●  (313) 961-4400

– 10 –

g.   Heed and appreciate that Ms. Brown is going through medication withdrawal;

h.   Heed and appreciate that Ms. Brown cannot properly convey her symptoms since she is experiencing hallucinations and is incoherent;

i.   Help adjust medications as needed;

j.   Heed and appreciate that Ms. Brown is a fall risk;

k.   Verify that appropriate fall precautions are in place;

l.   Recommend and help write orders for appropriate fall precautions;

m.   Ensure that Ms. Brown is not sleeping on a top bunk bed;

n.   Promptly evaluate Ms. Brown when she has neurological symptoms that include, but are not limited to, being incoherent, having hallucinations, having acute mental status changes, and being unable to move;

o.   Perform appropriate neurological and musculoskeletal exams on Ms. Brown;

p.   Promptly evaluate Ms. Brown when it is documented that she fell off her top bunk bed;

q.   Refrain from moving Ms. Brown after she falls off the top bunk of her bed;

r.   Refrain from moving Ms. Brown when she suffers a fall and then complains of being unable to move;

s.   After Ms. Brown falls from the top bunk of her bed, promptly call paramedics or appropriate healthcare personnel to safely move her and transport her to a hospital;

t.   Regularly and thoroughly evaluate Ms. Brown and perform a proper physical exam and review of systems;

u.   Heed and appreciate that Ms. Brown did not urinate or defecate at all after suffering a fall and promptly have her transported to a hospital;

v.   Promptly evaluate Ms. Brown when it is documented that she is unable to move without assistance;

w.   Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation and spine (including cervical spine) imaging studies;

- 11 -

McKeen & Associates, P.C.  ●  645 Griswold Street, Suite 4200  ●  Detroit, MI 48226  ●  (313) 961-4400

x.    Promptly send or make a recommendation to send Ms. Brown to a hospital for evaluation on the morning of April 24, 2021;

y.    Promptly send or make a recommendation to send Ms. Brown to a hospital when she becomes incoherent, is having hallucinations, and / or is experiencing acute mental status changes;

z.    Refrain from failing to perform neurological and musculoskeletal exams on Ms. Brown;

aa.    Refrain from failing to promptly send Ms. Brown to the hospital for evaluation;

bb.    Consult with any and all necessary specialists;

cc.    Obtain informed consent;

dd.    Advocate for the safety of Ms. Brown;

ee.    Follow the chain of command as needed;

ff.    Notify the physician of any acute changes;

gg.    Notify the physician when Ms. Brown falls from the top bunk;

hh.    Notify the physician when Ms. Brown is unable to move; and

ii.    Guard against any other negligent act or omission that may come to light during the course of discovery in this matter.

25.    It is my opinion, based upon the available information, as well as my training knowledge, education, and experience as a registered nurse, that there was a failure to do those acts listed above, and such omissions constitute violations of the applicable standard of care.

26.    In order to have conformed to the standard of care, the above-named should have done those things listed in the respective subsections above.

27.    As a direct and proximate result of Karen Hutchinson's, LPN, failure to identify

McKeen & Associates, P.C.  ●  645 Griswold Street, Suite 4200  ●  Detroit, MI 48226  ●  (313) 961-4400

Lisa as a fall risk, and failure to implement proper precautions to avoid Lisa suffering a fall, and failure to initiate appropriate treatment once Lisa fell from her bed, Lisa suffered a fall when she fell from the top bunk bed, and she had waited 2½ - 3 days before she received medical treatment. Now her left side is numb and stiff, and she walks with a cane and requires a wheelchair for long distances.

28.     Had Karen Hutchinson, LPN performed a proper Fall Risk Assessment, initiated proper Fall Risk Protocol for Lisa's condition, and initiated appropriate treatment once Lisa fell from her bed, Lisa would not have suffered the fall on April 24, 2021 and/or would not have suffered neurological deficits due to the delay in receiving appropriate treatment.

29.     Had this fall been avoided, or timely treatment received, Lisa would have the full use of the left-side of her body. If not for the negligence of Lisa's healthcare providers, the left-side of her body would not have sustained injuries.

30.     This opinion is based upon a review of the information to date and may or may not change upon review of additional materials.

31.     CHS TX, Inc.,  a duly accredited and licensed health care institution, by and through their agents, actual and/or ostensible, servants and/or employees, including but not limited to, Derek Steele, RN., Allison LaFriniere, RN., Allison LaFriniere, LPN, and Karen Hutchinson, LPN, which holds itself out to the public as being competent of rendering medical services, when confronted with a patient with the signs and symptoms such as those demonstrated by LISA LEE ALICE BROWN, owed a duty to:

> a.  Select, employ, train, and monitor its agents, actual and/or ostensible, servants, employees and/or its staff of physicians, nurses, and residents, to ensure they were competent to perform adequate medical care for a patient;
>
> b.  Ensure that appropriate policies and procedures are adopted and followed; and

- 13 -

McKeen & Associates, P.C. ● 645 Griswold Street, Suite 4200 ● Detroit, MI 48226 ● (313) 961-4400

c.  Guard against any additional acts of negligence identified through the discovery process

32.    As a direct and proximate result of Lisa Lee Alice Brown's healthcare providers' failure to identify Lisa as a fall risk, failure to implement proper precautions to avoid Lisa suffering a fall, and failure to obtain timely and appropriate treatment following her fall, Lisa suffered a fall when she fell from the top bunk bed, and she had waited 2½ - 3 days before she received medical treatment. Now her left side is numb and stiff, and she walks with a cane and requires a wheelchair for long distances.

Further Affiant sayeth not.

STEPHEN FURMAN, RN

Subscribed and sworn to before me on
this _15_ day of _October_, 2023

_____ [Name sign]
Notary Public _Buckingham_ [County]
My Commission Expires: _10/31/2023_

SHANKEISHA R MARROW
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES OCT. 31, 2023
COMMISSION # 7846471

McKeen & Associates, P.C.   ●   645 Griswold Street, Suite 4200   ●   Detroit, MI 48226   ●   (313) 961-4400

- 14 -